Caroline E. STRICKLAND, Plaintiff–Appellant,

and

Arthur Charlton and Joyce Healy, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

Nos. 99–5019, 99–5026.

United States Court of Appeals, Federal Circuit.

Dec. 15, 1999.

Graeme H. Strickland, Jr., of Lake Oswego, Oregon, argued for plaintiff-appellant.

Jerome C. Muys, Muys & Associates, P.C., of Washington, DC, argued for plaintiffs-appellants.

Kristine S. Tardiff, Attorney, U.S. Attorney's Office, Environmental and Natural Resources Division, General Litigation Section, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Lois J. Schiffer, Assistant Attorney General and David C. Shilton, Attorney, Environmental and Natural Resources Division, Appellate Section, Department of Justice, of Washington, DC.

Before MICHEL, RADER, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

## DECISION

This is an appeal from an order of the United States Court of Federal Claims granting Appellee's motion for summary judgment on the grounds that Appellants' suit was time-barred. *See Strickland v. United States*, 42 Fed.Cl. 41 (1998). For the reasons that follow, we conclude that the Court of Federal Claims erred in granting summary judgment and we reverse and remand.

## HISTORICAL BACKGROUND

This case represents the clear and repetitious intent of the United States Congress to resolve a pernicious land issue that has taken five generations to bring to a conclusion. In 1897, Congress enacted the Forest Management Act (the "1897 Act"), Act of June 4, 1897, 30 Stat. 11 (1897), in response to President Grover Cleveland's efforts to establish a system of national forest reserves. The 1897 Act included a "forest in lieu selection" provision, whereby an owner of an unperfected bona fide claim or tract of land within a designated national forest reservation could relinquish the claim or reconvey the land to the United States, and then select in lieu thereof an equal acreage of vacant public land ("lieu land") then open to settlement:

> That in cases in which a tract of land covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim of patent.

*Id.* at 36.

Appellants' predecessors in interest were owners of such lands.[1] They quitclaimed real property to the United States in 1904 pursuant to this provision, but did not at that time make a selection of lieu land.

The 1897 Act did not limit the lieu right to the actual settlers on the lands involved, but extended it to owners of such lands generally. *Id.* As a result, there ensued a number of fraudulent and scandalous transactions whereby land speculators and railroads acquired control of a number of potentially valuable lands within the forest reserves. As abuse and fraud came to be

---

1. For sake of convenience, all further references to "Appellants" include their predecessors in interest.

associated with the lieu program, Congress repealed the 1897 Act in 1905 and enacted a substitute statute (the "1905 Act"). Act of March 3, 1905, 33 Stat. 1264 (1905). Although the 1905 Act repealed the forest lieu program, it preserved the contracts entered into and applications for lieu lands that had been submitted prior to the repeal of the 1897 Act. The 1905 Act did not provide, however, for those owners who, like Appellants, had previously relinquished their land to the United States by deed but had not yet made a selection of lieu land. Concerned by this shortcoming, the United States Senate passed a resolution in 1906 directing the Secretary of the Interior (the "Secretary") to provide it with a list of all such persons.[2] *See* 40 Cong. Rec. 3947 (1906).

To remedy the inequity to these persons who had relinquished land but had not received land in exchange, Congress acted again in 1922 by passing another statute (the "1922 Act"). The 1922 Act authorized the Secretary to accept the lands transferred by the identified persons and in exchange the Secretary could issue a patent for lieu property selected by the grantor or allow the grantor to cut and remove timber from other national forest lands. Act of September 22, 1922, Pub.L. No. 67–339, 42 Stat. 1017 (1922). Only those landowners who filed applications for lieu lands or timber within five years, however, were given this "last chance" to receive compensation under one of these options, and many never met this deadline. Appellants were among those who did not apply for a timber allowance or a lieu land selection under the 1922 Act. *Id.* § 1.

Apparently, Appellants were not alone in failing to close out their claims. Congress once again attempted to deal with these unresolved claims by passing another remedial statute in 1930 (the "1930 Act"). Act of April 28, 1930, Pub.L. No.

'71–174, 46 Stat. 257 (1930). The 1930 Act gave those who had not yet received compensation under the previous statutes one more "last chance" to avail themselves of a remedy. Under the 1930 Act, the United States would reconvey lands previously relinquished to the United States under the 1897 Act back to the original owners who, like Appellants, had not filed for one of the options under the 1922 Act. Nevertheless, a number of claims, including those of Appellants, remained unresolved. The remedy afforded by the 1930 Act lay dormant until the 1950's, when it began to be used by some parties as a means of obtaining reconveyance of certain highly valuable lands that were now within areas that had been established as national forests or national parks. *See* H.R.Rep. No. 102–89, 102d Cong., 1st Sess., at 5 (1991). This led to "what the public press, conservation interests and others regarded as being virtually a give-away of public resources approaching a scandal." Sen. Rep. No. 1639, 86th Cong., 2d Sess. (1960), *reprinted in* 1960 U.S.C.C.A.N. 2743, 2744.

In response, Congress again revisited the matter and in 1960 enacted what came to be known as the Sisk Act. Act of July 6, 1960, Pub.L. No. 86–596, 74 Stat. 334 (1960). This statute gave those who had conveyed their property under the 1897 Act, but who had not yet received lieu lands or other compensation for their previously relinquished lands, another "last chance" to file a claim for compensation within one year after enactment. *Id.* The Sisk Act also provided that any lands for which payments were or might have been made would be part of the national park or forest within which they were located.[3] *Id.* § 4. Under the Sisk Act, owners of such lands could voluntarily file claims for compensation of $1.25 per acre within one year of the statute's enactment. No

---

**2.** The Secretary compiled such a list, but for unknown reasons, Appellants' names were not on it. *Strickland,* 42 Fed.Cl. at 44.

**3.** The United States' title to such lands has been called into question by the decisions in *Oregon v. Bureau of Land Mgt.,* 876 F.2d 1419 (9th Cir.1989), and *Soda Flat Co. v. Hodel,* 670 F.Supp. 879 (E.D.Cal.1987).

claims were ever filed under the Sisk Act, however, and no compensation was ever granted to anyone, including Appellants, who were eligible to file a claim.

Attempting again to settle the status of these remaining claims, the Congress passed yet another "last chance" statute, the Western Lands Dispute Act in 1993. Act of July 2, 1993, Pub.L. No. 103–48, 107 Stat. 234 (1993). Like the prior acts, the Western Lands Dispute Act sought to resolve the remaining claims resulting from uncompleted transfers and neglected in lieu selections under the 1897 Act. The Western Lands Dispute Act provided that all lands for which compensation had not been sought should be quitclaimed back to the owners unless they were identified by the Secretaries of the Interior and Agriculture as "nationally significant lands." *Id.* § 2(a). It then directed the Secretaries to prepare a "final list" of lands that needed to be retained to meet public needs. *Id.* § 2(d). These lands would not be returned to the owners; rather, title would vest in the United States and the owners could bring suit for compensation within one year after publication of the final list. *Id.* § 3(a).

Pursuant to section 2(d), the Forest Service published its final list of nationally significant lands on December 26, 1995. *See* 60 Fed.Reg. 66,780 (1995). Appellants' properties appeared on that list, with the result that title to these properties was vested and confirmed in the United States by operation of law. Appellants subsequently filed claims for compensation in the Court of Federal Claims. Their claims were filed within the one-year limitations period of the Western Lands Dispute Act and the six-year statute of limitations for takings, but almost 36 years after the enactment of the Sisk Act. The government filed a motion for summary judgment and the court granted the motion and dismissed Appellants' complaint as untimely. *Strickland,* 42 Fed.Cl. at 49. This appeal followed.

## DISCUSSION

### A. Standard of Review

 We review an order granting summary judgment *de novo. Alves v. United States,* 133 F.3d 1454 (Fed.Cir. 1998). Questions of statutory construction of the type presented by this appeal are questions of law, which are likewise reviewed *de novo. Imazio Nursery, Inc. v. Dania Greenhouses,* 69 F.3d 1560, 1564 (Fed.Cir.1995); *see also Martin v. Secretary of Health & Human Servs.,* 62 F.3d 1403 (Fed.Cir.1995).

### B. The Applicability of the Western Lands Dispute Act to Appellants

 The government maintains that the Sisk Act applies to Appellants and time-bars their claims because Appellants failed to file the claims within the statute's one-year limitations period. Appellants, on the other hand, assert that their claims are governed by the limitations period of the Western Lands Dispute Act, within which they were timely filed. The parties frame their principal arguments around the issue of whether the Sisk Act vested title to Appellants' lands in the United States, thereby extinguishing any remaining interest Appellants had in the properties. We believe that this issue is subsumed by the overarching question of whether the Western Lands Dispute Act and its limitations period apply to Appellants.

Our starting point is always the language of the statute. *See Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Section 1(b) of the statutory text declares that the purpose of the Western Lands Dispute Act is "to resolve the status of title to base lands affected by the [prior statutes]." 107 Stat. 234 § 1(b). As set forth in section 1(a)(3), Congress was concerned with those "who have acted to transfer base lands, or their successors in interest, [and

who] have never obtained either (A) a patent to the lieu lands or any other consideration for their relinquishment, or (B) a quitclaim of their base lands, notwithstanding relief legislation enacted in 1922 and 1930." *Id.* § 1(a)(3). In section 1(a)(6) of the statute, Congress also recognized that "[a]bsent further legislation, lengthy and expensive litigation will be required to resolve existing questions about the title to lands covered by section 4 of the 1960 Act." *Id.* § 1(a)(6). Most important, however, is the language of section 1(a)(4), whereby Congress unambiguously indicates that it passed the Western Lands Dispute Act because the Sisk Act had been wholly ineffective in disposing of these pending claims: "By the [Sisk Act] ... Congress established a procedure to compensate persons affected by the [earlier] Acts ... who had not received appropriate relief under prior legislation. *However, no payments of such compensation were made under that Act.*" *Id.* § 1(a)(4) (emphasis added).

This language makes clear Congress' conclusion that even if the Sisk Act applied to a parcel of land for which title had been relinquished but for which no compensation had been paid, the Western Lands Dispute Act was necessary because the Sisk Act never resolved any of the title and compensation issues. Congress essentially concluded that the Sisk Act was ineffective in that it failed to close out the claims of those who did not timely file for compensation under earlier "last chance" statutes.[4] Thus, as it had done previously in 1922, 1930, and 1960, Congress resurrected the claims of those who had not yet received or applied for compensation under the 1897 Act and subsequent enactments.

The government argues that the Sisk Act extinguished any remaining interest that Appellants had in their property by vesting title in the United States. Specifically, the government contends that Appellants' interests were extinguished under section 1 of the Sisk Act, which provides that "[n]o person shall receive, or be entitled to receive, payment under this Act except upon demand therefor made in writing to the Secretary ... within one year from the date of this Act." *Id.* Because Appellants never made such a demand, the government concludes, their claims are now time-barred.

We cannot agree with this interpretation. To begin, we need not resolve whether Appellants' claims fall within the ambit of the Sisk Act. Instead, the proper focus is on the scope of section 3(b) of the Western Lands Dispute Act. We hold that the reference in section 3(b) to "any existing right, title, or interest [of the United States] established by the [Sisk Act]" applies only to those lands in which the rights vested because the transfer was already made. After all, this was true of the prior "last chance" statutes as well, as they left unaffected the rights that had already been settled by prior transfers and only addressed those cases for which no lieu land or other compensation had been afforded. *See* 107 Stat. 234 § 1(a). Moreover, to read the Western Lands Dispute Act not to apply to those situations in which title was previously transferred to the United States but for which no compensation was received would be to completely ignore the stated purpose of the statute. Indeed, such a reading would make the statute superfluous, given that all rights vested and that all claims for which compensation might have been made are now time-barred by the Sisk Act. We do not believe that Congress enacted the Western Lands Dispute Act knowing that the statute was unnecessary. To conclude this would vitiate the statute and ignore

---

4. Additional confirmation of Congress' belief in this regard can be found throughout the legislative history. *See, e.g.,* H.R.Rep. No. 102–89, 102d Cong., 1st Sess., at 5 (1991) ("[C]laims were not submitted within the deadline for all of the relinquished inholdings for which claims might have been made under the 1960 Sisk Act. Therefore, further legislation is necessary.").

Congress' purpose as stated in the text of the statute and elsewhere. *Cf. Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law. . . .").

In holding that the Sisk Act vested title to Appellants' lands in the United States and therefore barred their suit, the Court of Federal Claims stated that repeals by implication are disfavored and that the Sisk and Western Lands Dispute Acts must be read consistently. *Strickland*, 42 Fed.Cl. at 49 (citation omitted). We agree that repeals by implication should be shunned and that the result in this case requires a consistent reading of the two statutes. *See Watt v. Alaska*, 451 U.S. 259, 267, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (repeals by implication are to be avoided). However, we also believe that the conclusion drawn by the Court of Federal Claims was in error in light of the language and purpose expressed in the Western Lands Dispute Act. It could hardly have been Congress' intent to enact a statute for which there was no longer a purpose. Indeed, the enactment of legislation presupposes some change in the existing law. In the absence of any express repeal or amendment, the later statute is presumed to be in accord with the legislative policy embedded in the prior statutes so as to allow the prior and later statutes to be construed together. *See* 2A *Sutherland Statutory Construction* § 51.01, at 450 (4th ed.1984). The policy underlying all of the "last chance" statutes is the same: to close out those claims left open by repeal of the 1897 Act. Each time Congress enacted a "last chance" statute, it reaffirmed this purpose and resurrected the claims of those who had not yet applied for or received compensation. To read the Western Lands Dispute Act otherwise is to render it ineffective and superfluous.

The intent of Congress not to preclude claims by the statute of limitations contained in the Sisk Act is further made clear by the legislative history. As Senator Feinstein, who introduced the bill in the Senate, explained:

> [V]arious administrative programs, lawsuits and Congressional actions have attempted to address the thousands of title questions resulting from the conditional relinquishments [of the 1897 Act], but did not completely resolve the problem. ... Despite their equitable rights, these landowners may have no legal remedy because their claims may be barred by the applicable statute of limitations .... The bill I am introducing resolves the problem.

139 Cong. Rec. 2820, 2821 (daily ed. March 11, 1993) (statement of Sen. Feinstein).

The Report of the House Committee on Merchant Marine & Fisheries echoed this intent: "[S]ubsection 3(a) would prevent the United States from seeking to invoke a statute of limitations so as to bar a timely-filed claim authorized by the bill from being considered by the Claims Court...." H.R.Rep. No. 102–89, 102d Cong., 1st Sess., at 9 (1991). Perhaps most telling is the statement by Senators Wallop and Garn regarding the possibility that the government might invoke the statute of limitations bar as it has done in the instant case:

> [W]e want to emphasize our personal view that we believe it would be wholly inconsistent with the remedial purposes of this legislation for the Justice Department to assert any statute of limitations defense in the Claims Court other than the one year period provided for in the bill for bringing claims for takings under this legislation. Although we have been advised that any other statute of limitations defenses would probably not defeat a claimant's equitable claim of ownership, we are appalled that the Justice Department has even mentioned such a possibility, particularly given the role that the federal agencies and the Congress have played in the long delay involved in resolving this problem. To

**1316**

engage in such legal "bootstrapping" would be a "Catch–22" and an injustice of the highest order.

Sen. Rep. No. 102–329, 102d Cong., 1st Sess., at 17 (1991) (statement of Sens. Wallop & Garn).

While evidence of Congressional intent drawn from the legislative history is revealing and instructive, we rest our ultimate conclusion in the case at bar on the clear remedial purpose of the Western Lands Dispute Act as it is plainly revealed in the statutory text and in the development of the lieu lands program over the last century. We conclude that even if the Sisk Act applied to Appellants' lands, the Western Lands Dispute Act was enacted because the Sisk Act did not succeed in settling the title to and compensation for those who, like Appellants, had never resolved the issue of compensation under the 1897 Act. As such, even if Appellants' lands are covered by the provisions of the Sisk Act and the prior "last chance" statutes, we hold that their claims are not time-barred and that Appellants may go forward under the Western Lands Dispute Act.

Finally, Appellants have raised several additional arguments concerning the interpretation and constitutionality of the Sisk Act. We need not address these arguments in light of our decision that the Western Lands Dispute Act applies to Appellants' claims. *See Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (statute should be construed to avoid constitutional question if possible); *see also Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

## CONCLUSION
## REVERSED and REMANDED.

### COSTS

Each party to bear its own costs.